**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | | |
|---|---|---|
| AMBER HIRSCH, as administrator of the estate of decedent, MARCUS MAYS, and on behalf of decedent's next of kin, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | 19 CV 7398 |
| WILL COUNTY, Illinois, Will County Sheriff MIKE KELLEY, WILL COUNTY SHERIFF'S OFFICERS, Frederick ABDULLAH Derek COPPES, Edward HAYES Jr., Kevin VILLEGAS, Carmen DESADIER, Nathan LITTLE, and Charles KAVANAUGH, WILL COUNTY EMPLOYEE Erica QUENSEN-DIEZ, CORRECT CARE SOLUTIONS, INC and WELLPATH LLC, and former or current WELLPATH EMPLOYEES Penelope JOHNSON, Cindy SMITH, Guadalupe ZUNIGA, Olivia SIMPRI-MENSAH, Young SUN KIM, Kia GREEN, Amanda NORTH-SHEA, Carmina FELICIANO, Carmina SHAW, Corina SHAW, Deatrice BLACK, Molly WEIGEL, Donna PETRAUSKIS, Tiffany UTKE, Mohammed IBRAHIM, Patricia LOPARCO, Sheila CORRIGAN, and Jeffrey SAFFOLD, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Judge DURKIN Magistrate Judge CUMMINGS |
| Defendants. | ) | |

## <u>SECOND AMENDED COMPLAINT</u>

Plaintiff, AMBER HIRSCH, as administrator of the estate of decedent, MARCUS MAYS

and on behalf of MAYS's next of kin, by and through her attorneys, the Law Office of Thomas P.

Needham and The Hamilton Law Office, LLC, makes the following second amended complaint

against Defendant WILL COUNTY (COUNTY), Defendant Sheriff MIKE KELLEY (SHERIFF),

WILL COUNTY SHERIFF'S OFFICERS Frederick ABDULLAH, Derek COPPES, Edward

HAYES Jr., Kevin VILLEGAS, Carmen DESADIER, Nathan LITTLE, and Charles

KAVANAUGH (OFFICERS), WILL COUNTY EMPLOYEE Erica QUENSEN-DIEZ,

Defendant CORRECT CARE SOLUTIONS, INC, (CCS), WELLPATH, LLC (WELLPATH), and

WELLPATH, LLC EMPLOYEES Penelope JOHNSON, Cindy SMITH, Guadalupe ZUNIGA, Olivia SIMPRI-MENSAH, Young KIM, Kia GREEN, Amanda NORTH-SHEA, Carmina FELICIANO, Carmina SHAW, Corina SHAW, Deatrice BLACK, Molly WEIGEL, Donna PETRAUSKIS, Tiffany UTKE, Mohammed IBRAHIM, Patricia LOPARCO, Sheila CORRIGAN, and Jeffrey SAFFOLD (WELLPATH EMPLOYEES):

## INTRODUCTION

Marcus Mays died of an epileptic seizure in the Will County jail on the morning of November 8, 2018. He was 30 years old and the father of an 8-year-old daughter. Mays was diagnosed with epilepsy before his death. He was being cared for by a neurologist who prescribed him medicine to prevent seizures. When Mays was first admitted to the Will County jail approximately a week before his death, he told the jail staff that he had a history of grand mal seizures and that he took medication for this condition, and jail staff knew that he had suffered at least one seizure the week before. However, the COUNTY and CCS/WELLPATH EMPLOYEES did nothing with this information. Mays was not given any anti-seizure medicine. As a result of this gross indifference to his medical needs, Marcus Mays had a massive seizure and died alone and locked in his cell eleven days after his arrival.

This lawsuit is brought by the estate of Marcus Mays against the COUNTY, SHERIFF, CCS and WELLPATH, the private company that the COUNTY and SHERIFF employs to provide health care to the detainees at the Will County jail. Defendants are responsible for the tragic and preventable death of Marcus Mays. They violated his civil rights under federal law and caused his wrongful death under Illinois law.

## JURISDICITON and VENUE

1.      This is an action brought pursuant to 42 U.S.C. §1983 to address the deprivation, under color of law, of Plaintiff's rights under the United States Constitution and Illinois common and

statutory law.

2. This Court has jurisdiction of this case pursuant to 28 U.S.C. §§1331, 1343, and 1367.

3. Venue is proper under 28 U.S.C. §1391(b). All of the parties reside in this judicial district and the events pertaining to the claims made in this complaint occurred within this district.

## PARTIES

4. Plaintiff AMBER HIRSCH is a citizen of the United States who resides in Ozark, Missouri. Plaintiff is the mother of Marcus Mays's minor daughter, and the Administrator of Mays's estate, representing Mays's estate and his next of kin, their (now) 11-year-old daughter, A.H.

5. At the time of his death, Marcus Mays was a citizen of the United States and a pre-trial detainee at the Will County jail.

6. Defendant COUNTY is a local government entity in the State of Illinois and has the responsibility of funding and oversight at the Will County jail.

7. Defendant SHERIFF is the elected Sheriff of Will County, whose office is responsible for the oversight of Will County jail. Defendant SHERIFF is sued in his official capacity.

8. At all times relevant to this case, Defendant OFFICERS are or were correctional officers, or other employees and/or agents of Defendant SHERIFF who were acting with the scope of their employment and under color of law.

9. At all times relevant to this case, Defendant QUENSEN-DIEZ, is or was an employee and/or agent of Defendant COUNTY who was acting within the scope of her employment and under color of law and thus, her acts and omissions are directly chargeable to Defendant COUNTY, under Illinois law, pursuant to the doctrine of *respondeat superior*.

10. At all relevant times, Defendant CORRECT CARE SOLUTIONS, Inc. (CCS) was a corporation doing business in the Northern District of Illinois. Defendant CCS had a contract with Will County to provide medical care to inmates at the Will County jail. At all relevant

3

times, Defendant CCS through its employees and agents, was acting under color of law and in the scope of that employment, and thus, their acts and omissions are directly chargeable to Defendants COUNTY and SHERIFF, under Illinois law, pursuant to the doctrine of *respondeat superior*.

11. Defendant WELLPATH, LLC, is a corporation that does business in the Northern District of Illinois. Defendant WELLPATH acquired and merged with CCS in December of 2018. CCS and WELLPATH are the same corporate entity under the law and for the purposes of this lawsuit.

12. At all relevant times, as a result of the contract between Defendant WILL COUNTY and CCS, Defendant CCS/WELLPATH EMPLOYEES were responsible for the day-to-day medical care of inmates at the Will County jail. This responsibility included but was not limited to the assessment of need for medical care, writing reports on an inmate's admission at the jail, inquiring of the inmates about their health and any medicine they have been prescribed, making requests for follow-up medical care for inmates, and keeping the correctional staff informed of any medical problems an inmate had.

13. At all times relevant to this case, Defendant CCS Employees are or were agents of Defendant CCS/WELLPATH acting with the scope of their employment and thus, their acts and omissions are directly chargeable to CCS/WELLPATH, under Illinois law, pursuant to the doctrine of *respondeat superior*.

**FACTS**

14. In October 2018, Marcus Mays lived in Romeoville, Illinois, with his grandparents. He was 30 years old and had a seven-year-old daughter, A.H.

15. In October 2018, Mays suffered from a seizure disorder.

16. Mays had been diagnosed with epilepsy in 2016.

17. Mays was under the treatment of a neurologist and had been prescribed anti-seizure medicine.

18. On the night of October 27, 2018, Mays was at home where he lived with his grandparents and was visiting with other family members.

19. After midnight on October 28, 2018, Romeoville police officers were dispatched to Mays' home.

20. The Romeoville police officers did not charge Mays with any offense but they caused Mays to be transported to Presence St. Joseph Hospital in Joliet for a psychiatric evaluation.

21. Romeoville police officers were informed that Mays took anti-seizure medication for epilepsy.

22. Sometime after Mays arrived at the hospital, the Joliet Police were summoned.

23. The Joliet police officers who arrived at Presence St. Joseph Hospital arrested Mays.

24. After the Joliet police officers arrested Mays, they took him from the hospital and brought him to the Will County jail in Joliet.

25. At the Will County Jail, Defendants SIMPRI-MENSAH, QUENSEN-DIEZ, KIM, and one or more of the Defendant OFFICERS learned that Mays had a history of grand mal seizures.

26. At the Will County Jail, Defendants SIMPRI-MENSAH, QUENSEN-DIEZ, KIM, and one or more of the Defendant OFFICERS learned that Marcus Mays had a prescription for anti-seizure medication.

27. Defendant SIMPRI-MENSAH recorded the fact that Mays had a history of grand mal seizures in reports she generated during the intake process.

28. On November 1, 2018, Defendant QUENSEN-DIEZ also recorded the fact that Mays had a history of grand mal seizures and that had not been offered his anti-seizure medication at the Will County jail.

29. Defendant SIMPRI-MENSAH did not take reasonable measures to ensure that Mays received proper medical care despite learning that he suffered from grand mal seizures and that he was

5

prescribed medication for it.

30. Defendant QUENSEN-DIEZ did not take reasonable measures to ensure that Mays received proper medical care despite learning that he suffered from grand mal seizures and had not been given medication.

31. Defendant Doctor KIM was an employee of CCS, a doctor and the medical director in charge of Mays's medical care while he was being detained at Will County Jail.

32. KIM reviewed SIMPRI-MENSAH's reports regarding MAYS's history of grand mal seizures, yet Dr. KIM did nothing to ensure that MAYS received proper monitoring and medical care for his seizure disorder.

33. Defendant OFFICERS, QUENSEN-DIEZ and the other CCS/WELLPATH EMPLOYEES either interacted with Mays or they were made aware of his seizure disorder during the time that he was in custody at the Will County jail.

34. The CCS/WELLPATH EMPLOYEES had access to CCS/WELLPATH's records, which documented Mays's history of seizures.

35. Defendant CCS/WELLPATH's EMPLOYEES did nothing to ensure that Mays obtained proper medical care.

36. Defendants could have arranged for Mays to be seen by a doctor, but they did not.

37. Defendants failed to provide Mays with anti-seizure medication despite the fact that they had anti-seizure medications on site at the Will County jail while Mays was detained there.

38. Defendants did not make reasonable efforts to ensure that Mays was adequately monitored or that his condition was followed up on after he was admitted to the Will County jail.

39. Mays was not seen by any doctor while he was incarcerated at the Will County jail.

40. For eleven days, Mays was not even scheduled to see a doctor.

41. Mays was not given any medicine to treat his seizure disorder while he was incarcerated at the

Will County jail.

42. When an epileptic who is on anti-seizure medicine stops taking the medicine suddenly, there is an increased risk of the number and severity of seizures. It is widely known in the medical profession that if an epileptic is going to stop taking the medicine prescribed for him, the medicine's dosage should be gradually tapered.

43. On the morning of November 8, 2018, Marcus Mays had massive seizure in his cell and died.

44. Defendants OFFICERS, QUENSEN-DIEZ, and CCS/WELLPATH EMPLOYEES failure to address Mays's serious health condition increased the risk that Mays would suffer a seizure like the one that killed him on November 8, 2018.

### CCS/WELLPATH'S History of Unconstitutionally Deficient Healthcare

45. Privatized medical care inside prisons and jails has become scandalously deliberately indifferent, causing serious injuries and death to incarcerated people around the country.

46. A major factor in this nationwide pattern is the use of private, for-profit, medical companies providing care in jails, a practice motivated by the desire to cut costs.

47. The treatable conditions and diseases of incarcerated populations are taken less seriously and even ignored by these private corporations. Incarcerated people are left to suffer and even die without receiving timely medical intervention. Many of these deaths are from preventable or treatable diseases that rarely kill people who are not incarcerated.

48. The use of private companies, and the contracts between them and the detention facilities shift various costs, encourage cost reduction and discourage proper oversight. The for-profit motive contributes significantly to the development of widespread practices, policies and training that cause deliberate indifference to the prisoners' medical needs, including disincentivizing use of the appropriate level medical staff to evaluate illness and transfers for needed medical care, and ignoring detainees' medical needs or treating detainees as though medical issues are faked or

exaggerated.

49. Defendant CCS/WELLPATH is the nation's largest for-profit provider of health care to correctional facilities.

50. Defendant CCS/WELLPATH has won government contracts that span more than 50 facilities in 34 states.

51. Defendants COUNTY and WELLPATH are a part of the nationwide problem and have maintained unconstitutional policies and customs regarding providing medical care to detainees.

**The Contract Between Wellpath and Will County**

52. Defendants CCS/WELLPATH and COUNTY had a contractual agreement by which CCS/WELLPATH would provide medical services at the Will County Adult Detention Facility.

53. In 2006, WILL COUNTY privatized the medical care in Will County jail by contracting with CORRECT CARE SOLUTIONS, INC to provide all medical care to the jail's detainees.

54. The contract between WILL COUNTY and CCS required CCS to provide adequate medical care to the detainees at Will County jail and to maintain three million dollars in liability insurance.

55. On February 1, 2017, WILL COUNTY renewed its contract with CCS.

56. The February 2017 contract renewal was for a term of three years.

57. Prior to Mays' incarceration at the Will County jail, Defendant COUNTY failed to ensure that CCS was providing adequate medical care to inmates being detained at the Will County jail and it failed to enforce the terms of its contract with CCS.

*CCS/Wellpath's Substandard Care: Other Lawsuits*

58. Defendant CCS/WELLPATH has been sued more than a thousand times for constitutional

violations and medical malpractice.

59. In its bid to provide healthcare services at the Will County Adult Detention Facility, Defendants CCS/WELLPATH provided Defendant County with a list of its litigation history and negative media coverage.

60. Prior to the renewal if its contract with CCS/WELLPATH in 2017, Defendant COUNTY knew or should have known that CCS/WELLPATH was paying millions of dollars to settle cases across the nation as a result of the substandard care it was providing to prisoners.

*CCS/Wellpath's Substandard Care: Contract Monitor's Findings*

61. Pursuant to Will COUNTY's contract with CCS/WELLPATH, Defendant COUNTY retained a contract monitor who audited Defendant CCS/WELLPATH's compliance with the contract and provision of medical services inside the jail.

62. Prior to Mays's death, the contract monitor conducted three audits of CCS's compliance with the healthcare contract – in January, May, and September 2018.

63. After each audit, the contract monitor submitted a report with her findings to Deputy Chief Dale Adams and Chief Dale Santerelli, of the SHERIFF's office.

64. The contract monitor also communicated her findings to Defendant CCS/WELLPATH's Health Services Administrator, Jennifer Briscoe.

65. Jennifer Briscoe communicated the contract monitor's findings to her supervisor at CCS.

66. In her three visits before Mays's death, the contract monitor found serious deficiencies in CCS's provision of medical care in the Will County Adult Detention Facility.

67. Specifically, the contract monitor found legal violations in CCS's pharmacy, including the relabeling of pill containers in violation of pharmacy law.

68. The contract monitor also found that Defendant KIM was relabeling inmate specific medications as "stock" medication in violation of pharmacy law and FDA regulations.

69. The contract monitor also found that CCS employees were impermissibly "pre signing" the Nursing Verification Logbook, before actually conducting any verification.

70. Prior to Mays' death, Defendant COUNTY knew or should have known that there were serious deficiencies in CCS's provision of medical care in the Will County Adult Detention Facility.

### *Wellpath's Substandard Care: Under Staffing*

71. In the eight months preceding Mays' death, the average daily population inside the Will County Adult Detention Facility was 685 detainees.

72. At all relevant times, Defendant KIM was the only MD on staff at the Will County Adult Detention Facility.

73. Also during this time, Defendant KIM was the only MD on staff for the McHenry County Jail.

74. Defendant KIM was expected to be "on call" 24/7 at the Will County Adult Detention Facility.

75. Defendant KIM reported feeling overworked.

76. Defendant KIM told at least one detainee that he knew he was making errors and failing to provide appropriate medical care because he was overworked.

77. Defendants COUNTY and CCS/Wellpath knew or should have known that Defendant KIM was overworked which resulted in errors and a failure to provide reasonably adequate medical care.

78. The contract monitor found high vacancy rates and high staff turnover for healthcare positions at the Will County Adult Detention Facility.

79. Briscoe, CCS/Wellpath's HSA attributed the high turnover of CCS/Wellpath employees to CCS/Wellpath's low pay rate for these positions.

80. The contract monitor also noted increases in nurse call offs, bad morale, and mandated overtime among the CCS/Wellpath employees.

81. Defendant COUNTY knew or should have known that Defendant CCS/Wellpath was failing to adequately staff the Will County Adult Detention Facility with healthcare staff, resulting in constitutionally deficient medical care.

### *Wellpath's Substandard Care: NCCHC Accreditation*

82. The National Commission on Correctional Health Care (NCCHC) is an organization that conducts audits of healthcare services inside of prisons and jails.

83. If the facility passes the audit, it receives an NCCHC Accreditation.

84. In the NCCHC audit immediately preceding Mays's death, the NCCHC found that Defendant CCS was not in compliance with NCCHC Essential Standard for Chronic Care.

85. Defendant COUNTY knew or should have known that CCS was not in compliance with the NCCHC Essential Standard for Chronic Care during this audit.

86. Pursuant to the healthcare contract between Will COUNTY and CCS, the loss of NCCHC Accreditation is grounds for the termination of the contract.

87. Defendant COUNTY knew that CCS was not in compliance with NCCHC Essential Standard for Chronic Care.

88. Yet, despite CCS's failure to meet the standards for accreditation, Will COUNTY failed to terminate its contract with CCS.

89. In fact, despite CCS's lengthy litigation history, its failure to meet NCCHC Essential Standards, and despite the contract monitor's findings, Defendant COUNTY subsequently renewed its contract with CCS.

90. WILL COUNTY's decision to renew its contract with CCS, despite CCS's many failings, was motivated by financial considerations.

91. Defendant COUNTY knew or should have known that many other counties had terminated their contracts with CCS for providing substandard medical care to detainees.

11

## COUNT I
### (42 U.S.C. §1983, Due Process claim)

92. Each of the preceding paragraphs is incorporated as if fully restated here.

93. As more fully described above, Mays had a serious medical need: he was suffering from a seizure disorder.

94. As more fully described above, Defendants' actions or omissions with respect to Mays were objectively unreasonable and/or deliberately indifferent towards the serious medical needs of Mays and to the substantial risk of harm to him.

95. Defendants failed to take appropriate steps to treat, supervise, and/or protect Mays, which was objectively unreasonable and/or constituted deliberate indifference towards his serious medical needs in violation of the Fourth and Fourteenth Amendment to the United States Constitution.

96. As a result of the objectively unreasonable and/or deliberately indifferent way in which Defendants treated Marcus Mays, they directly and proximately caused him to suffer physical and emotional pain and suffering before he died, diminished his chances of survival and/or caused the loss of his life, and caused his estate to incur funeral and burial expenses

**WHEREFORE**, Plaintiff prays for judgment against Defendants in a fair and just amount sufficient to compensate the Estate of Marcus Mays for May's damages, for punitive damages against the individual defendants, plus court costs and attorney's fees and any other relief the Court deems to be just and equitable.

## COUNT II
### (42 U.S.C. §1983, *Monell* claim – Defendant SHERIFF)

97. Each of the preceding paragraphs is incorporated as if fully restated here.

98. A sheriff in any county in Illinois, such as Defendant SHERIFF, is the final policy- making authority over a county jail's operations.

99. As detailed above, Mays's constitutional rights were violated when Defendants were objectively

unreasonable and/or deliberately indifferent towards his serious medical needs.

100. The violation of Mays's right to due process was caused in part by the customs, policies, and widespread practices of Defendant SHERIFF, which result in the failure to provide adequate medical care to the inmates in the Will County jail.

101. These widespread or "de facto" policies include: (1) fostering an atmosphere where correctional officers and medical staff are permitted to disregard inmates' medical complaints; (2) failing to ensure that supervisors at the jail review the intake records for newly admitted inmates to ensure appropriate health care is being provided to inmates with chronic care conditions, such as Marcus Mays, (3) failure to supervise and monitor Defendant OFFICERS who are working at the jail to make sure that inmates with serious health issues are being cared for; (4) failure to properly train and supervise correctional officers' training with respect to recognizing serious medical conditions of detainees; (5) failure to reasonably supervise Defendant CCS/WELLPATH's delivery of medical care to detainees in the Sheriff's custody; (6) the renewal of CC'S/WELLPATH's contract even after Defendants SHERIFF and COUNTY knew or reasonably should have known that CCS was failing to provide a minimum standard of care to detainees at Will County jail, that CCS and its employees were violating pharmaceutical law, and that CCS was failing to comply with its contractual obligations; (7) CCS and the SHERIFF's failure to maintain an adequate system of notification between CCS employees and the SHERIFF's correctional officers to ensure that the officers responsible for supervising detainees were aware of detainees' serious medical conditions and the need to monitor certain detainees more closely; (8) the SHERIFF's failure to properly staff the jail, by either not having enough staff on duty or by allowing correctional officers to work while ill and unable to perform their jobs properly.

102. Defendant COUNTY and Defendant SHERIFF have long been aware that failing to provide

adequate and timely treatment to detainees experiencing serious and life-threatening medical needs is unconstitutional.

103. As a direct and proximate result of these acts and omissions, Mays experienced severe pain and suffering and ultimately death, and his estate incurred funeral and burial expenses.

**WHEREFORE**, Plaintiff prays for judgment against Defendant COUNTY and Defendant SHERIFF in a fair and just amount sufficient to compensate the Estate of Marcus Mays for Mays's damages, plus equitable relief, plus court costs and attorney's fees and any other relief the Court deems to be just and equitable.

**COUNT III**
(42 U.S.C. §1983, *Monell* policy claim – Defendant WELLPATH)

104. Each of the preceding paragraphs is incorporated as if fully restated here.

105. Defendant CCS/WELLPATH has assumed responsibility, by virtue of the contract it has with Will COUNTY and the public funds it is paid by Will COUNTY, with providing medical care to all inmates in the Will County jail.

106. Defendant CCS was responsible for the establishment and implementation of policies and procedures to make sure that inmates receive basic medical care consistent with what the United States Constitution requires.

107.  As detailed above, Marcus Mays's right to due process was violated when Defendant CCS EMPLOYEES were objectively unreasonable and/or deliberately indifferent towards his serious medical needs.

108. The violation of Mays's right to due process was caused in part by the customs, policies, and widespread practices of Defendant CCS/WELLPATH, which resulted in the failure to provide adequate medical care to the inmates who rely on the company for medical care.

109. These widespread or "de facto" policies include: (1) failure to establish rules and practices to make sure that intake admission information is promptly reviewed by a medical professional so

14

that those inmates who need prompt care are helped; (2) failure to maintain and enforce a policy requiring CCS/WELLPATH Employees to contact the doctors who have been treating an inmate prior to incarceration so that care can be continued and coordinated; (3) failure to establish a system whereby Defendant CCS/WELLPATH Employees contact the family members of inmates who have serious medical issues to verify the medical care an inmate has been receiving prior to incarceration; (4) failure to ensure that inmate requests for medical attention are reviewed and acted upon in a prompt manner; (5) failure to properly staff jails and prisons, so that an appropriate level medical care provider is addressing health care concerns and to prevent the overworking of CCS/WELLPATH medical personnel; (6) fostering an atmosphere where employees are permitted to disregard inmates' serious medical needs; (7) failure to supervise, train, investigate, and/or discipline employees; (8) failure to appropriately staff jails and prisons in an effort to cut costs; (9) failure to maintain and enforce practices to make sure that detainees that have chronic health conditions such as seizure disorders are scheduled to see a doctor more quickly than detainees with no health conditions; (10) failure to establish rules and practices for healthcare staff to flag important health information for the doctor; (11) failure to train staff to recognize and respond appropriately to detainees' serious medical needs, including seizure disorders; (12) failure to ensure that detainees with chronic care conditions are scheduled to see a doctor during their intake screening.

110. Defendant CCS/WELLPATH maintains an explicit policy of not housing detainees with a history of seizures in the medical pod unless the detainee had a seizure within the last 24 hours.

111. CCS/WELLPATH's explicit policy not to house detainees who have suffered a seizure very recently but more than 24 hours before, like Mays, result in detainees in need of medical care not being housed in the medical pod and not being monitored appropriately.

112. Defendant CCS/WELLPATH has long been aware that failing to provide adequate and timely

treatment to detainees experiencing serious and life-threatening medical needs is unconstitutional.

113. As a direct and proximate result of these acts and omissions, Mays experienced severe pain and suffering and ultimately death, and his estate incurred funeral and burial expenses.

**WHEREFORE**, Plaintiff prays for judgment against Defendant CCS/WELLPATH in a fair and just amount sufficient to compensate the Estate of Marcus Mays for May's damages, plus equitable relief, plus court costs and attorney's fees and any other relief the Court deems to be just and equitable.

## COUNT IV
(42 U.S.C. §12101, et seq., Americans With Disabilities Act: Will County )

114. Each of the preceding paragraphs is re-alleged as if fully restated here.

115. Title II of the Americans with Disabilities Act (42 U.S.C. §§12131-12134) applies to Defendants WILL COUNTY and SHERIFF.

116. The Will County Jail is a facility, and its operation comprises a program and service for Title II purposes.

117. Mays had epilepsy, a medical disability under the ADA, throughout the time he was in the Defendants' custody and care.

118. Defendants failed to reasonable accommodate Mays's medical disability and to modify their facilities, operations, services, accommodations and programs to reasonable accommodate Mays's disability, in violation of Title II of the ADA.

119. Defendants' violations of the ADA were the proximate cause of Mays's injuries, damages and death and the resulting damage to his estate.

120. Plaintiff is entitled to recover, as the representative of Mays's estate, for those damages sustained as described in this Complaint as a result of Defendants' violations of the ADA which caused his death.

**WHEREFORE**, Plaintiff prays for judgment against Defendants COUNTY and SHERIFF in a fair and just amount sufficient to compensate the Estate of Marcus Mays for May's damages, punitive damages, plus court costs and attorney's fees and any other relief the Court deems to be just and equitable.

## COUNT V
(42 U.S.C. §12101, et seq., Americans With Disabilities Act: CCS/Wellpath )

121. Title II of the Americans with Disabilities Act (42 U.S.C. §§12131-12134) applies to Defendant WELLPATH.

122. The Will County Jail is a facility, and its operation comprises a program and service, for Title II purposes. CCS/WELLPATH has contracted to provide services for a portion of the operation of the jail facility.

123. Mays had epilepsy, a medical disability under the ADA, throughout the time he was in the Defendants' custody and care.

124. Defendant CCS/WELLPATH failed and refused to reasonable accommodate Mays's medical disability and to modify their jail facilities, operations, services, accommodations and programs to reasonable accommodate Mays's disability, in violation of Title II of the ADA.

125. Defendant's failures cost Mays his life, and the violations of the ADA are the proximate cause of Mays's death and the resulting damage to his estate.

126. Plaintiff is entitled to recover, as the representative of Mays's estate, for those damages sustained as described in this Complaint as a result of Defendants' violations of the ADA which caused his death.

**WHEREFORE**, Plaintiff prays for judgment against Defendant CCS/WELLPATH in a fair and just amount sufficient to compensate the Estate of Marcus Mays for May's damages, punitive damages, plus court costs and attorney's fees and any other relief the Court deems to be just and equitable.

## COUNT VI
### (740 ILCS 180/1 *et seq.*, Illinois Wrongful Death)

127. Each of the preceding paragraphs is incorporated as if fully restated here.

128. As more fully described above, Defendants owed Mays the duty to refrain from willful and wanton acts or omissions that could cause him suffering or death.

129. As more fully described above, Defendants breached their duty of care to Mays by willfully and wantonly committing one, more, or all of the following acts or omissions: ignoring the serious medical needs of Mays; failing to bring Mays's condition to the attention of medical personnel so that Mays could be properly treated; refusing Mays's requests for medical attention; failing to provide timely access to medical treatment for a serious condition of which they were aware; failing to monitor Mays for the foreseeable risk of an epileptic seizure; and/or otherwise acting willfully and wantonly towards Mays, in disregard for his medical needs.

130. As a direct and proximate result of one or more of the foregoing willful and wanton acts and/or omissions of Defendants, Marcus Mays died on November 8, 2018.

131. He was survived by a daughter, A.H., who is 8 years old and who is his next of kin under Illinois law.

132. Defendant COUNTY, Defendant SHERIFF, and Defendant CCS/WELLPATH are sued in this count of the complaint under the doctrine of *respondeat superior*; therefore, those government entities are responsible for their employees' acts or omissions, which were performed while they were acting within the scope of their employment.

133. As a result of the wrongful death of Marcus Mays, his daughter has suffered and will continue to suffer profound grief as well as the loss of support, society and comfort in the future.

**WHEREFORE,** Plaintiff prays for a judgment against Defendants, jointly and severally, in a fair and just amount to compensate Mays's daughter for the damages she has suffered due to the loss of her father Marcus Mays, and such other relief as this Court deems just and equitable.

18

## COUNT VII
### (Illinois Survival Claim – Willful and Wanton Claim)

134. Each of the preceding paragraphs is incorporated as if fully re-stated here.

135. As more fully described above, Defendant OFFICERS and Defendant CCS/WELLPATH EMPLOYEES owed Mays the duty to refrain from willful and wanton acts or omissions that could cause Mays harm.

136. As more fully described above, Defendant OFFICERS and Defendant CCS/WELLPATH EMPLOYEES breached their duty of care by willfully and wantonly committing one, more, or all of the following acts or omissions: ignoring Mays's serious medical needs; failing to bring Mays's condition to the attention of medical personnel so that Mays could be properly treated; refusing Mays's requests for medical attention; failing to provide timely access to medical treatment for a serious condition of which they were aware; failing to monitor Mays for the foreseeable risk of an epileptic seizure; and/or otherwise acting willfully and wantonly toward Mays, in total disregard for his medical needs and safety.

137. As a direct and proximate result of one or more of the foregoing willful and wanton acts and/or omissions of Defendant OFFICERS and Defendant CCS/WELLPATH EMPLOYEES, Mays suffered serious emotional and physical pain and suffering prior to his death on November 8, 2018.

**WHEREFORE**, Plaintiff prays for a judgment against Defendants, jointly and severally, in a fair and just amount sufficient to compensate Decedent's estate for the physical and emotional harm Mays suffered prior to his death, and such other relief as this Court deems just and equitable.

## COUNT VIII
### (Illinois Survival Claim, Intentional Infliction of Emotional Distress)

138. Each of the foregoing paragraphs is incorporated as if fully restated here.

139. In October 2018, May was suffering from epilepsy.

19

140. Defendants knew that Mays needed medical care, and through their willful and wanton acts or omissions, they failed to take reasonable action to summon medical care for him.

141. Defendants' willful or wanton disregard of Mays' severe physical and emotional distress constitutes extreme and outrageous conduct.

142. Defendants knew their failure to help Mays was likely to, and did, cause Mays to suffer severe emotional distress, which he did suffer before he died.

**WHEREFORE**, Plaintiff prays for judgment against Defendants, jointly and severally, in a fair and just amount sufficient to compensate Mays's estate for the injuries he has suffered, as well as such other relief that is just and equitable.

## COUNT IX
(State Law Claim for Medical Malpractice: Defendants KIM and SIMPRI-MENSAH )

143. Each of the foregoing paragraphs is incorporated as if fully restated here.

144. Defendants KIM and SIMPRI-MENSAH had a duty to Marcus Mays to exercise reasonable care for his medical condition, in accordance with the standards of care in the community of physicians (for Defendant KIM) and nurses (for Defendant SIMPRI-MENSAH).

145. Defendants KIM and SIMPRI-MENSAH breached their duty to Marcus Mays to exercise reasonable care for his medical condition, in accordance with the standards of care in the community of physicians (for Defendant KIM) and nurses (for Defendant SIMPRI-MENSAH).

146. Defendants KIM and SIMPRI-MENSAH were both negligent and deviated from the standard of care they were supposed to follow in one or more of the following respects:

    a) Defendant SIMPRI-MENSAH failed to notify other CCS/Wellpath staff members that Mays had a history of seizures;

    b) Defendant KIM failed to meet or speak with Mays after learning that he had a history of seizures;

    c) KIM failed to order anti-seizure medication for Mays;

d) SIMPRI-MENSAH failed to request a medication order for Mays' seizure disorder.

e) KIM and SIMPRI-MENSAH both failed to ensure that Mays was scheduled for an appointment with a medical doctor in a reasonable amount of time;

f) KIM and SIMPRI-MENSAH made no effort to inform correctional officers that Mays had a history of seizures, so that they could more closely monitor him;

g) KIM and SIMPRI-MENSAH failed to alert the other CCS/WELLPATH employees that an inmate who they were responsible for (Marcus Mays) had a history of seizures;

h) Both KIM and SIMPRI-MENSAH failed to contact the hospital where Mays had been treated in the hours before he was admitted to the Will County ADF;

i) KIM and SIMPRI-MENSAH made no effort to speak with the doctors or nurses who had previously treated Mays for seizures, even though those medical professionals worked near the Will County ADF;

j) Neither KIM nor SIMPRI-MENSAH ever offered any anti-seizure medicine to Mays, even though a plentiful supply of them were on hand at the Will County ADF;

k) KIM and SIMPRI-MENSAH made no effort to consult with or refer Mays to a specialist who had more experience treating patients who have epilepsy or a seizure disorder;

l) The Will County ADF has a medical wing where inmates receive a higher level of care and more attention than on the regular tiers of the facility; however, KIM and SIMPRI-MENSAH failed to take any steps to ensure Mays was assigned to that medical wing;

m) KIM and SIMPRI-MENSAH, after learning that Mays had a history of seizures, did nothing to treat this serious health condition with any sense of urgency or importance; instead, their approach to Mays was indistinguishable from the attention afforded to a prisoner who was healthy and had no chronic illness;

147. The suffering of Mays when he experienced a fatal seizure, and the death from that seizure, were proximately caused by the negligence and breach of the standard of care by KIM and SIMPRI-MENSAH, as described above.

148. The negligence of KIM and SIMPRI-MENSAH, as described above, was the direct and proximate cause of the damages suffered by Mays and his estate.

**WHEREFORE,** Plaintiff Amber Hirsch demands compensatory damages, jointly and severally, against Defendants CCS/WELLPATH, KIM and SIMPRI-MENSAH, jointly and

severally, and for whatever other relief the Court deems just and equitable.

**PLAINTIFF DEMANDS A TRIAL BY JURY.**

Respectfully submitted,

AMBER HIRSCH,  Plaintiff and
Administrator for the Estate of Marcus Mays

By: /s Thomas P. Needham
    Attorney for Plaintiff

    Law Office of Thomas P. Needham
    53 W. Jackson Blvd., Suite 620
    Chicago, IL 60604
    (312) 726-3171
    tpn@needhamlaw.com

By: /s Torreya L. Hamilton
    Attorney for Plaintiff

    The HAMILTON LAW OFFICE, LLC
    53 W. Jackson Blvd., Suite 620
    Chicago, IL 60604
    312.726.3173
    tlh@thehamiltonlawoffice.com